# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

RONALD JOHN CALZONE, )
)
    Plaintiff, )
)
v. )
) No. 2:16-cv-04278-NKL
NANCY HAGAN, et. al )
)
    Defendants. )
)
)

## ORDER

Before the Court is Plaintiff Ron Calzone's Motion for Temporary Restraining Order, [Doc. 2]. For the following reasons, the Motion is denied.

### I. Background

In his verified complaint, Plaintiff Ronald Calzone describes himself as "a citizen activist who is passionate about the principles of individual liberty and constitutionally limited government." [Doc. 1, p. 1]. He states that no entity has "designated him to serve as its lobbyist," and "no one pays him to share with the state's legislators his thoughts about the best approach to public policy". *Id.*

The evidence shows however that Mr. Calzone is the incorporator and director of Missouri First Inc., a non-profit organization that "seeks to assert and defend the appropriate sovereignty of Missourians." [Doc. 1-2, p. 36 of 52]. Mr. Calzone is the only officer of Missouri First. He is the registered agent of Missouri First and he is one of three members of the Board of

Directors of Missouri First. [Doc. 17-1, p. 13 of 239:10–22]. The Charter of Missouri First States:

> Missouri First will give priority to educating and mobilizing the public to meet our objectives. Media advertising, public oratory, informational seminars, *legislative lobbying*, and citizen involvement may be used to teach or to influence public policy. . . . Missouri First will campaign for legislative and ballot issues . . .

[Doc. 1-2, p. 26 or 52] (emphasis added).

Missouri First's website seeks members to join it to further the agenda of Missouri First:

> By joining Missouri First, you place your name and influence on the *right* side of the issues affecting Missourians. The old saying "there is strength in numbers" holds true, especially when lobbying Missouri House and senate members. . . . All we ask is that you agree with the principles outlined in our Charter and fill out the form below. . . .We ask this form to be completed that we may better keep you informed on Missouri issues, and to bolster our [your] clout when fighting the war for sovereignty.

[Doc. 17-1, pp. 14 of 239:13 – 25; 15 of 239:1–7] (emphasis in the original).

Missouri First's website also permits Missourians to fill out "witness forms" to give an opinion about proposed or pending legislation. Missouri First, Inc., states that it will present all witness forms to the appropriate committee of the Missouri General Assembly.

Mr. Calzone regularly comes to meet with individual legislators, legislative staff, and other legislative groups, to talk about specific legislation and potential legislation, and what should be passed or blocked. *Id.* at 18 of 239:21–25; 19 of 239:1–3. He would typically identify himself as "Ron Calzone, Director of Missouri First, or Ron Calzone, a director of Missouri First." *Id.* at 88 of 239:13–18. On a witness form in the Missouri Senate:

> Mr. Calzone identifie[d] himself as appearing on behalf -- not of himself but appearing on behalf of Missouri First, Inc. When he signed that and said I'm appearing on behalf of Missouri First, Inc., he was the only officer for Missouri First, Inc. He was the president and he was the secretary.

2

*Id.* at 19 of 239:4–11.

Mr. Calzone is aware that people in Jefferson City have complained that he should be registered under Missouri law as a lobbyist because of his activities in the Missouri Capitol. Mr. Calzone admits he clearly lobbies but contends he is not a "legislative lobbyist" under Missouri law. He also says "[t]hat his hat was—he felt his hat was to represent the faceless mask of citizens who did not have a lobbyist." *Id.* at 96 of 239:18–24. There is no evidence in the record that anyone other than Calzone has spoken to legislators to further the lobbying commitment of Missouri First, Inc.

Under Mo. Rev. Stat. § 105.470, Missouri defines a lobbyist as:

> [A]ny natural person who acts for the purpose of attempting to influence the taking, passage, amendment, delay or defeat of any official action on any bill, resolution, amendment, nomination, appointment, report or any other action or any other matter pending or proposed in a legislative committee in either house of the general assembly, or in any matter which may be the subject of action by the general assembly and in connection with such activity" who also:
> . . .
> (c) Is designated to act as a lobbyist by any person, business entity, governmental entity, religious organization, nonprofit corporation, association or other entity."

Based on this statute, the Missouri Ethics Commission received two complaints against Calzone, one in 2014 and another in 2016, asserting he violated the statute because he was designated as a lobbyist for Missouri First but had not registered, paid a lobbying fee, or made regular reports to the state as required.

The 2014 complaint against Calzone was filed by Missouri Society of Governmental Consultants. [Doc. 1-2, Exhibit B]. On September 3, 2015, the Ethics Commission held a hearing

3

on the complaint. The Parties have submitted the transcript of that hearing to this Court as evidence.

The Missouri Ethics Commission found probable cause to believe that Calzone violated the lobbying statute because he:

> ....attempted to influence official action on matters pending before the Missouri Legislature in 2013 and 2014, and while doing so acted on behalf of Missouri First, Inc. and its members, as a regular pattern of conduct and consistent with a Charter purpose of Missouri First, Inc., and that Respondent Calzone knowingly did not register as a lobbyist.

[Doc. 1-2, p. 33 of 52]. The Commission specifically found that:

> Since 2013, Respondent Calzone has been designated by the action of Missouri First, Inc., and its constituent members for the purpose of attempting to influence official action on the bills, resolutions, amendments, and other matters, when Respondent Calzone, acting consistent with the purpose of Missouri First, Inc., and its member, met with legislators and legislators' staff to support or oppose matters pending before the Missouri Legislature, testified in opposition or support of matters pending before the Missouri Legislature, submitted witness forms as requested by individuals who provided those forms to Respondent Calzone through Missouri First, Inc., and by appearing as a witness before committees of the Missouri Legislature for the purpose of representing the interests of Missouri First, Inc., and its members.

*Id.* at 27–28 of 52.

Calzone appealed the decision of the Missouri Ethics Commission and the Administrative Hearing Commission ordered discovery. Calzone then sought a writ of prohibition from the Cole County Circuit Court, which Judge Beetem granted on procedural grounds, finding Missouri law does not allow corporations to file complaints with the Ethics Commission. [Doc. 2-1, p. 6]; *Calzone v. Admin. Hearing Comm'n*, Case No. 16ACCC00155 (Mo. 19th Cir. Sept. 23, 2016) ("Because the complaint . . . was not filed by a natural person . . . all actions taken on the

4

complaint are and were void"). The Ethics Commission appealed that decision to the Missouri Court of Appeals on October 31, 2016, where it remains pending.

Another complaint against Calzone was filed before the Missouri Ethics Commission on October 12, 2016. This complaint was substantively identical to the 2014 complaint but was unquestionably filed by a natural person, Michael C. Reed. [Doc. 1-2, Exhibit A].

On October 21, 2016, Calzone filed suit in this Court seeking a temporary restraining order to prevent the enforcement of Mo. Rev. Stat. § 105.470 against him. The Court initially abstained because of the October 12, 2016 proceeding pending before the Missouri Ethics Commission. However, the 2016 complaint was later dismissed by the Commission and this Court found it had no further basis for abstention. The matter was then set for a TRO hearing at which neither Calzone nor anyone else testified. No documents were submitted to the Court other than Calzone's verified complaint and the transcript of the hearing before the Missouri Ethics Commission.[1]

Calzone's federal suit challenges Mo. Rev. Stat. § 105.470(5)(c) both facially and as-applied, alleging the statute "violates the First Amendment freedom of speech and the freedom to assemble and to petition the government for a redress of grievances." [Doc. 1, p. 2]. He claims that the statute cannot be applied to him because it would be unconstitutional to apply the Missouri lobbying statute to an uncompensated person.[2] He also claims that the statute is

---

[1] Both the verified complaint and the transcript are arguably hearsay and inadmissible but can be considered at this stage of the proceeding. *178 Lowell St.Operating System,LLC v. Nichols*, 152 F. Supp. 3d 47 (D. Mass. 2016).

[2] The only evidence that Calzone is uncompensated is his own statement in the verified complaint. Calzone did not testify at the September 2015 Ethics Commission hearing, invoking his rights under the Fifth Amendment. *See* [Doc. 17-1, p. 134 of 239:10–15]. Mr. Calzone did not testify during this Court's February 3, 2017 hearing on this Motion either, although given an opportunity to. Instead Calzone submitted his verified complaint, [Doc. 1], which was not subject to cross examination. *See* Transcript of 2/3/2017 Oral Argument, Calzone v. Hagan, (No. 16-4278). In addition, in his Suggestions in Support of his Motion, Mr. Calzone states under oath that the Missouri Ethic Commission acknowledged that "the

5

unconstitutional on its face because the word designate is too vague a term for a reasonable person to understand it.

## II. Analysis

Calzone requests a temporary restraining order (TRO) prohibiting investigation by the Missouri Ethics Commission into any complaint pursuant to Mo. Rev. Stat. § 105.470 against any person who is not compensated for their lobbying activities. A TRO is an extraordinary equitable remedy, and the movant bears the burden of establishing its propriety. *See Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003). The Eighth Circuit has identified four independent factors which must be considered in analyzing a motion for a temporary restraining order or a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

### A. Likelihood of Success on the Merits

The threshold matter in any motion for injunctive relief that seeks to enjoin the implementation of a duly enacted state statute is the likelihood that the movant will succeed on the merits. *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008).

#### 1. Applied Challenge

---

record was devoid of evidence that anyone had paid Mr. Calzone for his activism …or that any third party had designated him to act as its lobbyist," citing to page 8, ¶ 32 and page 7 ¶ 30 respectively. Calzone's Suggestions in Support, [Doc. 2-1, 4]. This misstates the record. Page 7 ¶ 30 quotes from the Webster International Dictionary for the definition of the word "designate" and page 8 ¶ 32 contains a definition of the word "employ" from the same dictionary and cites to Mo. Rev. Stat. § 105.470.

6

Calzone argues that Mo. Rev. Stat. § 105.470(5)(c) cannot be applied to him because he was not compensated by Missouri First to do lobbying.

To resolve this issue, it is important to understand what the Missouri Ethics Commission actually found. Contrary to Calzone's suggestion that he is being penalized for expressing his own views to Missouri legislators, the Ethics Commission found that "[s]ince 2013, Respondent Calzone has been designated by the action of Missouri First, Inc., and its constituent members for the purpose of attempting to influence official action on the bills, resolutions, amendments, and other matters . . ." [Doc. 1-2, Exhibit D]. Therefore, the Commission found that he was speaking on behalf of Missouri First and not for himself.

Calzone argues that even if Mr. Calzone was designated to lobby for Missouri First, he cannot be subject to the requirements of Missouri's lobbying statute because he was uncompensated. Calzone contends that if the Missouri lobbying statute is applied to him, an uncompensated person, the statute does not serve a compelling state interest, nor is it narrowly tailored to fit that interest. *See Wersal v. Sexton*, 674 F.3d 1010 (8th Cir. 2012).[3]

Calzone bases his constitutional challenge on *United States v. Harriss*, 347 U.S. 612 (1954). In *Harriss,* the U.S. Supreme Court analyzed a First Amendment challenge to required disclosures under the Federal Regulation of Lobbying Act. The Supreme Court found the government had a vital interest in requiring disclosure of those who are paid to influence legislators and legislative staff, as a means of determining "who is being hired, who is putting up the money, and how much." *Id.* at 625. The Supreme Court limited the statute "to those persons . . . who solicit, collect, or receive contributions of money or other thing of value" to be used for lobbying purposes—and it required registration only "if the principal purpose of either the

---

[3] Calzone argues that the strict scrutiny standard applies and the Court will assume he is correct for purposes of this TRO proceeding.

7

persons or the contributions is to aid" in lobbying activities. *Id.* at 619. Calzone argues that by limiting the Act in that way, the Supreme Court effectively held that the government only had an interest in regulating compensated lobbyist.

The Court disagrees. First, the Supreme Court limited the federal statute to persons compensated for their advocacy, as a matter of statutory construction not because of any constitutional concern. "The Government urges a much broader construction—namely, that under § 305 a person must report his expenditures to influence legislation even though he does not solicit, collect, or receive contributions as provided in § 307. Such a construction, we believe, would do violence to the title and language of § 307 as well as its legislative history." *Harriss* 347 U.S. at 619–20. Second, the actual constitutional issue in *Harriss* was whether a person's advocacy had to be directed to members of Congress or could just be directed to "propagandize the general public". *Id.* at 620. If the latter, the statute would cover any person giving a speech that sought to indirectly influence legislation, even though that speech was not given to a member of Congress. To avoid this potential constitutional problem the Supreme Court gave the word lobbying, which is the title of the Act, its ordinary meaning—which was in that context communicating with members of Congress. Finally, while the Supreme Court found that there was a governmental interest in requiring paid lobbyists to register, it never found nor implied that the government only had an interest in regulating paid lobbyists. That issue has never been addressed by the Supreme Court or any other court, to the best of this Court's knowledge.

Having found that *Harriss* does not stand for the proposition that the First Amendment only permits paid lobbyists to be regulated, the Court turns to Calzone's argument that there is no compelling governmental reason to require uncompensated lobbyist to register.

8

The Court finds there is a clear and strong governmental interest in lobbying transparency—in allowing the public to know who is seeking to influence legislators on behalf of someone else and who might be making expenditures for lobbyists. Standing alone, transparency is a sufficient compelling interest to justify the minimal burdens of registration. Transparency is part of the foundation of a democracy, particularly when it comes to how governmental officials are being influenced and by whom. In addition, there is a valid governmental interest in maintaining a list of lobbyists who purport to speak to legislators on behalf of third parties so that third parties can monitor whether those lobbyists in fact are authorized to speak on behalf of the third parties. Preventing fraud is a compelling governmental interest.

Finally, other than citing to *Harriss,* which the Court has found is not on point, Calzone does not explain why it is unconstitutional to require transparency for persons who are paid to lobby but not for those who lobby without pay. Both are attempting to influence legislators for third parties and the public has a right to know who is behind those efforts. Knowing who is operating in the political arena is a valid governmental interest regardless of whether someone volunteers on behalf of a third party or is paid by the third party.

Therefore, the Court finds that Calzone is unlikely to succeed on the merits of his as applied claim.

### 2. Facial Challenge

Calzone also challenges the constitutionality of the Missouri lobbyist statute on the grounds of vagueness. This is a facial challenge, which means that it can only succeed if on its face the Missouri lobbyist statute ". . . fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Reprod. Health Servs. of*

*Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1143 (8th Cir. 2005) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

Missouri defines a "legislative lobbyist" as:

> [A]ny natural person who acts for the purpose of attempting to influence the taking, passage, amendment, delay or defeat of any official action on any bill, resolution, amendment, nomination, appointment, report or any other action or any other matter pending or proposed in a legislative committee in either house of the general assembly, or in any matter which may be the subject of action by the general assembly and in connection with such activity" who also:
> . . .
> (c) Is **designated** to act as a lobbyist by any person, business entity, governmental entity, religious organization, nonprofit corporation, association or other entity."

Mo. Rev. Stat. § 105.470 (emphasis added).

Calzone contends that what is prohibited by the statute is not clearly defined. [Doc. 2, p. 13] (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Calzone also states that when "First Amendment rights are involved, an 'even greater degree of specificity' is required." *Id.* (citing *Buckley v. Valeo*, 424 U.S. 1, 77 (1976)).

As found by the Missouri Ethics Commissiion, the word "designate" can be defined readily.

> The term 'designate' is defined by Webster's Third New International Dictionary as 'to make known directly as if by sign; to distinguish as to class; Specify, stipulate; to declare to be; to name esp. to a post or function.'" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 612 (1986). 'Designate may apply to choosing or detailing a person or group for a certain post by a person or group having power or right to choose.' *Id.*

10

Case 2:16-cv-04278-NKL   Document 20   Filed 03/01/17   Page 10 of 15

[Doc. 1-2, Exhibit D, p. 7]. This is the common understanding of the word "designate", and thus the word does "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Reprod. Health Servs.*, 428 F.3d at 1143 (8th Cir. 2005).

Calzone relies on *Buckley v. Valeo*, 424 U.S. 1 (1976) to argue that "if the statute is being enforced in such a way that nobody can quite understand what the word designate means despite the fact that it seems to appear to have a relatively plain meaning, the statute would have to be struck." Transcript of 2/3/2017 Oral Argument at 22 (statement of Mr. Morgan). However, the statute in *Buckley* limited "any expenditure . . . relative to a clearly identified candidate." *Buckely*, 424 U.S. at 41. The Court found that "[t]he use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary between permissible and impermissible speech, unless other portions of [the statute] make sufficiently explicit the range of expenditures covered by the limitation." *Id.* at 41–42. Calzone has presented no such facial complications to the word "designate" and has offered no alternative reading that would allow the Court to find the word so vague that people of ordinary intelligence cannot understand what conduct it prohibits.

The Court recognizes that Calzone is effectively arguing that the word "designate" must be vague because otherwise the Ethics Commission could not have found that Missouri First designated Calzone as its lobbyist. In fact, he contends that the Commission found that he had "self-designated" himself to be a lobbyist for Missouri First, Inc., and suggests that this is evidence that the statute is too vague to pass constitutional muster. However, the Commission found no such thing. It found Missouri First designated him a lobbyist based on the circumstantial evidence before it which included Missouri First's Charter which states that legislative lobbying is used as a purpose and a method of operation. [Doc. 17-1, p. 14 of 239:1–5, 8–10]. Missouri First encourages new membership by stating: "That old saying, there is

11

strength in numbers, holds true, especially when lobbying Missouri House and Senate Members." *Id.* at 95 of 239:10–12. Thus, Missouri First recruited new members by promising strong lobbying and "working hard to represent your values in the issues that touch your life." *Id.* at 95 of 239:13–16. Mr. Calzone admits he was lobbying, but argues it was not on behalf of Missouri First. *Id.* at 89 of 239:8–10. Yet Mr. Calzone was the registered agent, president, secretary, and board member for Missouri First and held himself out as such when attempting to influence legislation. While this is not the forum to review the sufficiency of the evidence to support the Commission's findings, the evidence is clear that the word "designate" is not so vague that Calzone's First Amendment rights were somehow violated as a result of the factual findings by the Missouri Ethic's Commission.

Calzone is unlikely to succeed on the merits of his facial challenge.

### B. Threat of Irreparable Injury

The next *Dataphase* factor to consider is what if any irreparable harm will be suffered by Calzone if no TRO is issued. The Commission's investigation following the 2016 complaint has been dismissed. Even so, Calzone contends that he still suffers the threat of immediate, irreparable injury because "the Ethics Commission has not put down this misunderstanding of the statute. It still maintains to the best of our knowledge that it can apply the legislative lobbyist restriction and regulations against individuals who, without being paid to do so, petition their government for redress of grievances." Transcript of 2/3/2017 Oral Argument at 4, Calzone v. Hagan, (No. 16-4278) (statement of Mr. Morgan).

Although Calzone is no longer under investigation, he argues "the alleged harm need not be occurring or be certain to occur before a court may grant relief." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016)

(citation omitted). However, for Calzone to meet his burden, he "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Id.* (citing *Roudachevski v. All-Am. Care Ctrs., Inc.,* 648 F.3d 701, 706 (8th Cir. 2011)).

Calzone pleads "the Missouri Legislature is in session at this moment and Mr. Calzone would like to continue to participate in his First Amendment protected activities but he cannot do so and must self-silence for fear of this statute in some way, shape, or form being used against him." Transcript of 2/3/2017 Oral Argument at 8 (statement of Mr. Morgan). However, no one is preventing Mr. Calzone from participating in his First Amendment protected activities so long as he is speaking on his own behalf. *See* Transcript of 2/3/2017 Oral Argument at 10 (statement of Mr. Weisel) ("If Mr. Calzone again is going to be doing the same type of thing he did in the second complaint, of course, that's not a violation, we've now found that, and there won't be any action against Mr. Calzone.").

Nonetheless, he cannot speak on behalf of Missouri First without first registering as its lobbyist, so there is some small burden suffered if he is not granted a TRO.

### 3. Public Interest and Balance of Harm

The Court must also balance the alleged harm with any injury an injunction would inflict on other interested parties. *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 729 n.3 (8th Cir. 2008).

Defendant argues that the Ethics Commission "could receive a complaint that would be completely with merit and they won't be able to investigate it because of the possible TRO that could be issued by this Court." Transcript of 2/3/2017 Oral Argument at 11 (statement of Mr. Morgan). Calzone responded that he "simply ask[s] for an order that would estop any investigations, prosecutions, whatever, of complaints that allege a person—that do not allege that

a person has to be paid to be a lobbyist within the meaning [the statute]." *Id.* at 26 (statement of Mr. Weisel). Yet Calzone presents no alternative method for the Ethics Commission to determine whether an individual lobbying his or her government is being paid to do so without conducting the very investigation Calzone's proposed TRO would estop. Calzone's attempt to narrow the scope of the injunction he seeks is frustrated by practical circumstances. Calzone's requested TRO could inflict substantial harm on the Missouri Ethics Commission's ability to enforce the statute.

Conversely, at this time, the harm to Calzone is relatively small. As noted above, Mr. Calzone is still free to speak with legislators on his own behalf, which he contends is the only activity he has participated in all along. Should Mr. Calzone choose to speak on behalf of Missouri First, he need only register as a lobbyist and file the required reports. In the September 2015 hearing, the Ethics Commission heard the testimony of Randy Scherr. [Doc. 17-1, p. 32]. Mr. Scherr worked as a lobbyist since the late 1970s and serves on the board of the Missouri Society of Governmental Consultants. As part of his testimony, Mr. Scherr detailed the process for registering as a lobbyist in Missouri:

> [R]egistration is required at the beginning of the year. The annual requirement now takes, oh, I'd say a minute or two. You go on and you simply renew – enter your credit card number, pay your $10 --- or $11 I think. It maybe takes two minutes, three minutes to register . . .

*Id.* at 34 of 239:24–25; 35 of 239:1–4; 26 of 239:1–5. As for the other reporting requirements, Calzone acting for Missouri First has control over whether to trigger those requirements.

Here, the state of balance disfavors a TRO. The Commission has made clear that Mr. Calzone will not be investigated or penalized for failing to register as a lobbyist so long as he speaks only on behalf of himself and does not purport to represent Missouri First's lobbying

14

interests. Conversely, the potential harm to the Missouri Ethics Commission's ability to enforce this statute is substantial.

While the public has a strong interest in protecting free speech, Calzone is unlikely to succeed on his First Amendment claim. Therefore, the public interest is not in jeopardy.

### III. Conclusion

Because there is little likelihood that Calzone will succeed on the merits and any harm he might suffer by having to register is minor, he has failed to meet his burden to show he is entitled to a TRO. Calzone's Motion for Temporary Restraining Order, [Doc. 2], is denied. An in person hearing will be held on Plaintiff's Motion for Preliminary Injunction at a later date set by forthcoming Order.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: March 1, 2017
Jefferson City, Missouri