**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

RONALD JOHN CALZONE,                )
                                    )
            Plaintiff,              )
                                    )
v.                                  )
                                    )     No. 2:16-cv-04278-NKL
NANCY HAGAN, et. al                 )
                                    )
            Defendants.             )
                                    )

## ORDER

Plaintiff, Mr. Calzone contends that Missouri cannot require him to register as a lobbyist pursuant to Mo. Rev. Stat. § 105.470, *et seq.* because he is not paid to be a lobbyist and Missouri's definition of lobbyist is unconstitutionally vague. He makes both a facial challenge to the statute and an applied challenge and thus contends that any application of Missouri's lobbying statute to him is a violation of his First Amendment rights.[1] [Docs. 1, 2]. In his pending Motion for a Permanent Injunction, he seeks to permanently enjoin the Defendants from enforcing or threatening to enforce Mo. Rev. Stat. § 105.470(5)(c) and its attendant obligations against him. For the following reasons, the Court denies Mr. Calzone's motion.

## I.      Background

### A.  Procedural Background

---

[1]     Mr. Calzone suggests in his supplemental briefing, [Doc. 33] that he is merely asking that Missouri's lobbying statute should not be applied to him unless he is paid to be a lobbyist. In that same briefing, however, his counsel stated: "Rather, as regards his as-applied claim, Mr. Calzone simply asks that the Ethics Commission be required to determine that an individual was paid before it brands that person as an unregistered lobbyist." *Id.* at 7. As this quote shows, his counsel implicitly distinguishes between his applied challenge and his facial challenge. The Court has found no suggestion in his pleadings or elsewhere that he has abandoned his facial vagueness challenge and concludes that he seeks more than merely stopping the way the Commission has applied the statute to an uncompensated lobbyist.

Under Missouri law, all lobbyists must register and make reports as required. Mo. Rev. Stat. § 105.473. A lobbyist is defined for purposes of Missouri law as:

> [A]ny natural person who acts for the purpose of attempting to influence the taking, passage, amendment, delay or defeat of any official action on any bill, resolution, amendment, nomination, appointment, report or any other action or any other matter pending or proposed in a legislative committee in either house of the general assembly, or in any matter which may be the subject of action by the general assembly and in connection with such activity who also:
> . . .
> (c) Is designated to act as a lobbyist by any person, business entity, governmental entity, religious organization, nonprofit corporation, association or other entity."

Mo. Rev. Stat. § 105.470.

Based on these statutes, the Missouri Ethics Commission received two complaints against Calzone, one in 2014 and another in 2016, asserting he violated the statute because he was designated as a lobbyist for Missouri First but had not registered, paid a lobbying fee, or made regular reports to the state as required. Missouri First is a not-for-profit corporation that was incorporated by Mr. Calzone. Its mission is to ". . . assert and defend the appropriate sovereignty of Missourians." Mr. Calzone is Missouri First's registered agent and a director. He is the only officer of Missouri First. [Doc. 17-1, p. 13 of 239:10–22].

The 2014 complaint against Calzone was filed by Missouri Society of Governmental Consultants. [Doc. 1-2, Exhibit B]. On September 3, 2015, the Ethics Commission held a hearing on the complaint. Mr. Calzone did not testify at that hearing, invoking his Fifth Amendment rights. After considering the evidence submitted in that proceeding, the Missouri Ethics Commission found probable cause to believe that Mr. Calzone violated the lobbying statute because he:

….attempted to influence official action on matters pending before the Missouri Legislature in 2013 and 2014, and while doing so acted on behalf of Missouri First, Inc. and its members, as a regular pattern of conduct and consistent with a Charter purpose of Missouri First, Inc., and that Respondent Calzone knowingly did not register as a lobbyist.

[Doc. 1-2, p. 33 of 52]. The Commission specifically found that:

Since 2013, Respondent Calzone has been designated by the action of Missouri First, Inc., and its constituent members for the purpose of attempting to influence official action on the bills, resolutions, amendments, and other matters, when Respondent Calzone, acting consistent with the purpose of Missouri First, Inc., and its member, met with legislators and legislators' staff to support or oppose matters pending before the Missouri Legislature, testified in opposition or support of matters pending before the Missouri Legislature, submitted witness forms as requested by individuals who provided those forms to Respondent Calzone through Missouri First, Inc., and by appearing as a witness before committees of the Missouri Legislature for the purpose of representing the interests of Missouri First, Inc., and its members.

*Id.* at 27–28 of 52.

Calzone appealed the decision of the Missouri Ethics Commission and the Administrative Hearing Commission ordered discovery. Calzone then sought a writ of prohibition from the Cole County Circuit Court, which Judge Beetem granted on procedural grounds, finding Missouri law does not allow corporations to file complaints with the Ethics Commission. [Doc. 2-1, p. 6]; *Calzone v. Admin. Hearing Comm'n*, Case No. 16ACCC00155 (Mo. 19th Cir. Sept. 23, 2016) ("Because the complaint . . . was not filed by a natural person . . . all actions taken on the complaint are and were void"). The Ethics Commission appealed that decision to the Missouri Court of Appeals on October 31, 2016, where it remains pending and is set for oral argument July 6, 2017. WD80176.

Another complaint against Calzone was filed before the Missouri Ethics Commission on October 12, 2016. This complaint was substantively identical to the 2014 complaint but was unquestionably filed by a natural person, Michael C. Reed. [Doc. 1-2, Exhibit A].

On October 21, 2016, Calzone filed suit in this Court seeking a temporary restraining order to prevent the enforcement of Mo. Rev. Stat. § 105.470 against him. The Court initially abstained because of the October 12, 2016 proceeding pending before the Missouri Ethics Commission. However, the 2016 complaint was later dismissed by the Commission and this Court found it had no further basis for abstention. The case was then set for a TRO hearing at which neither Calzone nor anyone else testified. No documents were submitted to the Court other than Calzone's verified complaint and the transcript of the hearing before the Missouri Ethics Commission. The Court denied Calzone's Motion for a Temporary Restraining Order after finding he was unlikely to succeed on the merits of his claim. [Doc. 20].

On April 25, 2017, the Court held a hearing to consider Calzone's Motion for a permanent injunction, which this order now addresses. [Doc. 29].

### B. Factual Background

The evidence before the Court shows that Mr. Calzone is the incorporator and director of Missouri First Inc. [Doc. 1-2, p. 36 of 52]. Mr. Calzone is the only officer of Missouri First. He is the registered agent of Missouri First and he is one of three members of the Board of Directors of Missouri First. [Doc. 17-1, p. 13 of 239:10–22]. The Charter of Missouri First States:

> Missouri First will give priority to educating and mobilizing the public to meet our objectives. Media advertising, public oratory, informational seminars, *legislative lobbying*, and citizen involvement may be used to teach or to influence public policy. . . . Missouri First will campaign for legislative and ballot issues . . .

[Doc. 1-2, p. 26 or 52] (emphasis added).

Missouri First's website seeks members to join it to further the agenda of Missouri First:

> By joining Missouri First, you place your name and influence on the *right* side of the issues affecting Missourians. The old saying "there is strength in numbers" holds true, especially when lobbying Missouri House and senate members. . . . All we ask is that you agree with the principles outlined in our <u>Charter</u> and fill out the form below. . . .We ask this form to be completed that we may better keep you informed on Missouri issues, and to bolster our [your] clout when fighting the war for sovereignty.

[Doc. 17-1, pp. 14 of 239:13 – 25; 15 of 239:1–7] (emphasis in original).

Missouri First's website also permits Missourians to fill out "witness forms" to give an opinion about proposed or pending legislation. Missouri First, Inc., states that it will present all witness forms to the appropriate committee of the Missouri General Assembly.

Mr. Calzone regularly comes to meet with individual legislators, legislative staff, and other legislative groups, to talk about specific legislation and potential legislation, and what should be passed or blocked. *Id.* at 18 of 239:21–25; 19 of 239:1–3. He would typically identify himself as "Ron Calzone, Director of Missouri First, or Ron Calzone, a director of Missouri First." *Id.* at 88 of 239:13–18. On a witness form in the Missouri Senate:

> Mr. Calzone identifie[d] himself as appearing on behalf -- not of himself but appearing on behalf of Missouri First, Inc. When he signed that and said I'm appearing on behalf of Missouri First, Inc., he was the only officer for Missouri First, Inc. He was the president and he was the secretary.

*Id.* at 19 of 239:4–11.

Mr. Calzone is aware that people in Jefferson City have complained that he should be registered under Missouri law as a lobbyist because of his extensive lobbying activities in the Missouri Capitol. Mr. Calzone admits he clearly lobbies but contends he is not a "legislative lobbyist" under Missouri law. He also says "[t]hat his hat was—he felt his hat was to represent the faceless mask of citizens who did not have a lobbyist." *Id.* at 96 of 239:18–24. There is no

evidence in the record that anyone other than Calzone has spoken to legislators to further the lobbying commitment of Missouri First, Inc.

After the Court issued its ruling on Calzone's Motion for a temporary restraining order, the Parties submitted a list of stipulated facts. [Doc. 28]. The Parties jointly stipulated as to the authenticity and admissibility of "bank records regarding the sole account, checking or otherwise, of Missouri First, Inc." [Docs. 28; 28-1]. The Parties also stipulated to the following:

> 1. Plaintiff regularly speaks to legislators in an effort to persuade members of the General Assembly regarding legislation.
>
> 2. No natural or artificial person pays Plaintiff in exchange for sharing his views on policy with members of the General Assembly.
>
> 3. Plaintiff does not make expenditures for the benefit of one or more public officials or one or more employees of the legislative branch of state government in connection with such activity.
>
> 4. Plaintiff is the president and a member of the board of directors of a Missouri nonprofit corporation, Missouri First, Inc.
>
> 5. When speaking to legislators, whether in testimony before the General Assembly or in inperson meetings, Plaintiff regularly notes that he is a director of Missouri First, Inc.
>
> 6. The board of directors of Missouri First, Inc. has never taken official action to name Plaintiff as the legislative lobbyist for Missouri First, Inc.
>
> 7. For the past five years, Missouri First, Inc. has made no expenditures, nor received any income.
>
> 8. In response to a complaint filed by the Missouri Society of Governmental Consultants against Plaintiff on September 11, 2015, the Missouri Ethics Commission found probable cause that Plaintiff was a "legislative lobbyist" subject to the registration and reporting requirements imposed by § 105.473, RSMo.
>
> 9. The Missouri Ethics Commission is required by law to investigate any properly filed complaint submitted to its office. § 105.966, RSMo.
>
> 10. During the September 3, 2015 hearing before the Missouri Ethics Commission, Mr. Calzone introduced a motion to dismiss, which was rejected by the chair as improper after counsel for the Ethics Commission argued that the Commission was not authorized to grant motions to dismiss.

11. While the Missouri Ethics Commission dismissed a second complaint against Plaintiff on the grounds that "there was no evidence that [Plaintiff] provided witness forms regarding that bill on behalf of Missouri First to committee members or other members of the general assembly," that dismissal does not immunize Plaintiff from future complaints.

12. Because the Missouri Ethics Commission retains its records publicly on the Internet in perpetuity, registration as a legislative lobbyist forever labels that person as a "lobbyist."

13. The general registration and reporting requirements for legislative lobbyists are found at § 105.473, RSMo.

14. Missouri law requires "[a]ll information required to be filed" with the Commission to be kept available for public inspection and copying for five years after the information is filed. RSMo, § 105.473(6).

15. Lobbyists must file standardized registration forms under penalty of perjury within five days after beginning any activities as a lobbyist.

16. Registration forms must include the lobbyist's name and business address, the name and address of all persons such lobbyist employs for lobbying purposes, and the name and address of each lobbyist principal by whom such lobbyist is employed or in whose interest such lobbyist appears or works.

17. Registration costs ten dollars per year.

18. If any information changes, a lobbyist must file an updating statement under oath within one week of any addition, deletion, or change in the lobbyist's employment or representation.

19. In addition, the employer of a lobbyist may also notify the commission that a legislative lobbyist is no longer authorized to lobby for the principal and should be removed.

20. Lobbyists must also file, under penalty of perjury, monthly reports with the Ethics Commission.

21. These reports must list expenditures made by the lobbyist for the purpose of lobbying, including, inter alia, printing and publication expenses and travel expenses.

22. Twice a year, each legislative lobbyist must, report all proposed legislation or action that the lobbyist supported or opposed.

23. The Ethics Commission has provided a form for lobbyist reporting, which is provided at: http://www.mec.mo.gov/WebDocs/PDF/Fillable/Lobbyist/LOB_PrincList.PDF.

24. The Ethics Commission has not promulgated any regulations as to how a legislative lobbyist must describe the proposed legislation or actions that the lobbyist supported or opposed.

25. The Ethics Commission posts the contents of monthly lobbyist disclosure reports on the Internet.

26. Failure to file is punishable by a fine of up to $10,000.

27. The late fees for filing a monthly lobbyist disclosure report are ten dollars for every day such report is late.

28. A person who violates, in any way, a provision of the lobbyist registration regime shall be punished as follows: (1) for the first offense, a class B misdemeanor, (2) for any subsequent offense, a class E felony.

29. A class B misdemeanor may be punished by up to six months in prison.

30. A class E felony may be punished by up to four years in prison.

[Doc. 28]. The Parties' submitted these stipulations to the Court prior to the April 25, 2017 hearing.

## II. Analysis

Calzone requests a permanent injunction prohibiting "Defendants, their officers, employees, or agents, and those acting on their behalf or in concert with them from enforcing or threatening to enforce the disclosure requirements of Missouri Revised Statutes section 105.470(5)(c) against those who act without being compensated." [Doc. 2, p. 2]. An injunction is an extraordinary equitable remedy, and the movant bears the burden of establishing its propriety. *See Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003). The Eighth Circuit has identified four factors which must be considered in evaluating the propriety of a permanent injunction: (1) the party seeking the injunction faces irreparable harm, (2) actual success on the merits, (3) the harm to the movant outweighs any possible harm to others, and (4) the injunction serves the public interest. *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th

Cir.1981). To obtain a permanent injunction the movant must demonstrate actual success on the merits, rather than simply showing a propensity for success. *Bank One v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999).

As the Court previously explained, [Doc. 20], the State of Missouri is not preventing Mr. Calzone from participating in his own First Amendment activities so long as he is speaking as himself and not on behalf of a third party. *See* Transcript of 2/3/2017 Oral Argument at 10 (statement of Mr. Weisel). However, if instead Calzone is speaking for Missouri First, such as presenting Missouri First witness statements to legislators or lobbying on behalf of Missouri First, he is in jeopardy of Missouri's lobbying law being enforced against him. Mr. Calzone contends that this risk of enforcement causes him irreparable harm because it is a violation of the First Amendment to subject unpaid lobbyists to Missouri's lobbying statutes. This contention forms the basis of Mr. Calzone's applied challenge.

He also contends that even if the First Amendment permits unpaid lobbyists to be subject to Mo. Rev. Stat. § 105.4 70(5)(c), the term "designated" in that statute is vague and therefore is facially unconstitutional. This contention forms the basis of Calzone's facial challenge.

### A. Applied Challenge

Calzone's applied challenge is based on the First Amendment. Therefore, the Court must first determine what standard of review is appropriate.

#### 1. Standard of Review

Calzone argues that because his claim is based on the First Amendment, strict scrutiny is the correct standard of review. Transcript of 4/25/2017 Hearing at 3–4 (statement of Mr. Morgan). If a statute is subject to strict scrutiny, it can be enforced if it is "narrowly tailored" to

achieve a "compelling government interest." *See Republican Party v. White*, 416 F.3d 738, 749 (8th Cir. 2005).[2]

Calzone cites to *Minn. State Ethical Practices Bd. v. Nat'l Rifle Ass'n*, 761 F.2d 509, 511 (8th Cir. 1985), in which the Eighth Circuit examined Minnesota lobbyist and political fund registration requirements and held "[s]tate laws which inhibit the exercise of first amendment rights are unconstitutional unless they serve a 'compelling' state interest," which signals strict scrutiny. More recently, however, the U.S. Supreme Court noted: "Disclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' or 'prevent anyone from speaking.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 315 (2010) (citations omitted). The Supreme Court explained that because "disclosure is a less restrictive alternative to more comprehensive regulations of speech," statutes requiring disclosure are subjected to "'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 558 at 366–69 (citations omitted).

Courts since have applied exacting scrutiny, rather than strict scrutiny, to disclosure laws. *See Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 548–49 (4th Cir. 2012) (applying exacting scrutiny to federal provisions imposing disclosure and organizational requirements); *National Organization for Marriage v. McKee*, 649 F.3d 34, 55–56 (1st Cir. 2011) (applying exacting scrutiny review to Maine's law defining Political Action Committees); *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 118 (1st Cir. 2011) (applying exacting scrutiny review to

---

[2]     Calzone contends Defendant conceded that strict scrutiny is the proper standard of review. Transcript of 4/25/2017 Hearing at 24 (statement of Mr. Morgan). It is not clear to the Court that Defendant made such a concession, but even if the Commission stipulated to the level of scrutiny, the issue is purely legal and the Court must apply the correct standard regardless of the argument of the Parties. *See Craig v. Boren*, 429 U.S. 190, 197 (1976) (applying intermediate scrutiny despite the parties arguing for strict scrutiny and rational basis, respectively).

Rhode Island's independent expenditure reporting requirements); *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1003–05 (9th Cir. 2010) (applying exacting scrutiny to Washington's law defining PACs); *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc) (applying exacting scrutiny to federal laws imposing disclosure and organizational requirements); *Indep. Inst. v. Gessler*, 71 F. Supp. 3d 1194, 1198 (D. Colo. 2014), *aff'd sub nom. Indep. Inst. v. Williams*, 812 F.3d 787 (10th Cir. 2016).

Citing *Citizens United*, the Eighth Circuit noted:

> Generally, laws that burden political speech are subject to strict scrutiny, which requires the government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. But this is not true when the law at issue is a disclosure law, in which case it is subject to 'exacting scrutiny,' which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest.

*Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874–75 (8th Cir. 2012) (internal citations omitted).

Based on this precedent, the Court finds that exacting scrutiny is the correct standard of review for Calzone's First Amendment claim.

### 2. "Sufficiently Important" State Interest

Calzone relies primarily on *United States v. Harriss*, 347 U.S. 612 (1954) for his contention that the First Amendment protects unpaid lobbyists from being subjected to lobbying registration and disclosure requirements. *Harriss* concerned a First Amendment challenge to the Federal Regulation of Lobbying Act because of its disclosure and reporting requirements. The Supreme Court found the government had a vital interest in requiring disclosure of those who are paid to influence legislators and legislative staff, as a means of determining "who is being hired, who is putting up the money, and how much." *Id.* at 625. The Supreme Court limited the statute "to those persons . . . who solicit, collect, or receive contributions of money or other thing of

value" to be used for lobbying purposes—and it required registration only "if the principal purpose of either the persons or the contributions is to aid" in lobbying activities. *Id.* at 619. Calzone argues that by limiting the Act in that way, the Supreme Court effectively held that the government only had an interest in regulating compensated lobbyist.

The Court disagrees. First, the Supreme Court limited the federal statute to persons compensated for their advocacy, as a matter of statutory construction not because of any constitutional concern. "The Government urges a much broader construction—namely, that under § 305 a person must report his expenditures to influence legislation even though he does not solicit, collect, or receive contributions as provided in § 307. Such a construction, we believe, would do violence to the title and language of § 307 as well as its legislative history." *Harriss,* 347 U.S. at 619–20. Second, the actual constitutional issue in *Harriss* was whether a person's advocacy had to be directed to members of Congress or could just be directed to "propagandize the general public." *Id.* at 620. If the latter, the statute would cover any person giving a speech that sought to indirectly influence legislation, even though that speech was not given to a member of Congress. To avoid this potential constitutional problem the Supreme Court gave the word lobbying, which is the title of the Act, its ordinary meaning—communicating with members of Congress. Finally, while the Supreme Court found that there was a governmental interest in requiring paid lobbyists to register, it never found nor implied that the government only had an interest in regulating paid lobbyists. That issue has never been addressed by the Supreme Court or any other court, to the best of this Court's knowledge. Therefore, a reasonable reading of *Harris* does not imply, much less direct, that the First Amendment prohibits states from requiring unpaid lobbyists to register and report political expenditures. Nonetheless, because Mr. Calzone argues that no such governmental interest exists, the Court must

independently determine whether the state has an important governmental interest in regulating unpaid lobbyists.

At the April 25, 2017 hearing, Defendant identified the state's interest in its lobbying statute.

> Lobbyist registration provides the public with transparency as to who is making efforts to influence the legislature. Without such disclosures, the democratic government structure would not exist, and the opportunity for fraud, corruption, secrecy expand. The intent to influence legislation remains, regardless of compensation, and the public [has an] interest in knowing who is influencing the legislature and how that is happening.

Transcript of 4/25/2017 Hearing at 16 (statement of Ms. Harrison).

The Court finds that Missouri's interest in transparency is a sufficiently important governmental interest to justify this statute. Knowing who is operating in the political arena is a valid governmental interest regardless of whether someone volunteers on behalf of a third party or is paid by the third party.[3]

---

[3] Calzone asserts that the Ethics Commission must "do more than simply posit the existence of a disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural." [Doc. 33, p. 5] (citing *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995)). Because the Court finds the proper standard is exacting scrutiny, not strict scrutiny, Calzone's argument that Defendant must produce "some sort of evidence that the governmental interest is actually implicated" does not apply. Transcript of 4/25/2017 Hearing at 5 (statement of Mr. Morgan). Compare *SpeechNow.org v. Fed. Election Comm'n,* 599 F.3d 686, 696 (D.C. Cir. 2010) (noting that to survive exacting scrutiny, "the government may *point to* any 'sufficiently important' governmental interest") (emphasis added) with *Republican Party v. White,* 416 F.3d 738, 749 (8th Cir. 2005) ("The strict scrutiny test requires *the state to show* that the law that burdens the protected right advances a compelling state interest . . .") (emphasis added). Further, transparency in government is a matter of such self-evident importance in a democracy, that no statistical or other substantive evidence is required. Further, it has been found to be a compelling state interest by both the Eighth Circuit, see *Minnesota State Ethical Practices Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509 (8th Cir. 1985), and the U.S. Supreme Court. *See, e.g., McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334 (1995) ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation."); *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (discussing governmental interest in "alert[ing] the voter to the interests to which a candidate is most likely to be responsive and thus facilitat[ing] predictions of future performance in office").

This finding is supported by Eighth Circuit precedent. In *Minnesota State Ethical Practices Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509 (8th Cir. 1985), the National Rifle Association challenged the Minnesota Ethics in Government Act's requirement to register their lobbying and political funding activities. The Minnesota Act required persons defined as lobbyists to file registration forms and make regular reports of their lobbying activities. *Id.* at 511. [4] The Eighth Circuit acknowledged that "compelled disclosure" may infringe on First Amendment rights, but found the state's interest in, *inter alia*, "deterring corruption [and] avoiding the appearance of corruption" were "sufficiently important to outweigh the possibility of infringement." *Id.* at 512 (citations omitted). The Eighth Circuit found this interest compelling under strict scrutiny. *Id.*

The NRA attempted to distinguish *Harriss* and *Buckley* because the lobbying activity involved "members of a voluntary association." *Id.* The Eighth Circuit did not find the distinction constitutionally relevant: "The Act does not focus on the group affiliation of a lobbyist, it focuses on lobbying activity. When persons engage in an extensive letterwriting campaign for the purpose of influencing specific legislation, the State's interest is the same whether or not those persons are members of an association." *Id.* at 513.

Just as the State's interest is the same regardless of association, Missouri's interest in transparency is the same whether or not lobbyists are compensated. The State has a sufficiently important interest in allowing the public to know who is seeking to influence legislators on behalf of someone else and who might be making expenditures to governmental officials for the benefit of a third party. Transparency is part of the foundation of a democracy, particularly when it comes to how governmental officials are being influenced and by whom.

---

[4]     The Minnesota Act only applied to those "engaged for pay or consideration." Thus, the Eighth Circuit did not reach the issue of whether unpaid lobbyists can be subject to the same disclosure requirements.

### 3. Substantial Relation

Having found Missouri has a sufficiently important government interest in applying the statute to uncompensated lobbyists, the Court turns to whether there is "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008) (citations omitted).

Under the statute, any person "designated to act as a lobbyist by any person, business entity, governmental entity, religious organization, nonprofit corporation, association or other entity;" Mo. Rev. Stat. § 105.470.5(c), is required to:

> [F]ile standardized registration forms, verified by a written declaration that it is made under the penalties of perjury, along with a filing fee of ten dollars, with the commission. The forms shall include the lobbyist's name and business address, the name and address of all persons such lobbyist employs for lobbying purposes, the name and address of each lobbyist principal by whom such lobbyist is employed or in whose interest such lobbyist appears or works. The commission shall maintain files on all lobbyists' filings, which shall be open to the public.

*Id.* at 105.473.1. Defendant articulated the following regarding the relation between the requirement and the government's interest in transparency:

> [T]he list is designed to make sure that a person acts on lobbying on behalf of x and not y . . . Further, . . . when you go to testify before the legislature, you identify yourself and your organization so it's out there in the public sphere anyway. Those aren't private records. So the list is . . . [a] more easily accessible . . . vehicle to find out who is lobbying on behalf of what, what organization.

Transcript of 4/25/2017 Hearing at 23 (statement of Ms. Harrison).[5]

---

[5] Calzone contends the burdens imposed on him do not bear a relation to Missouri's proffered interest, in part because the federal government does not regulate unpaid lobbyists. [Doc. 33, p. 6]. However, exacting review does not suggest that all governmental entities must use the same or similar method for achieving the important goal of transparency. Calzone cites no case law that would support such a novel theory.

In *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012), the Eighth Circuit gave us guidance for how to determine whether there is a substantial relation between a lobbyist disclosure requirement and a substantial governmental interest. In that case, the Eighth Circuit found Minnesota's independent expenditure law was not substantially related to the government's interest under exacting scrutiny because "its ongoing reporting requirement . . . is untethered from continued speech [and] does not match any sufficiently important disclosure interest." *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 876 (8th Cir. 2012). The Eighth Circuit explained: "Minnesota can accomplish any disclosure-related interests—providing the electorate and shareholders information concerning the source of corporate political speech, deterring corruption, and detecting violations of campaign finance laws—'[t]hrough less problematic measures,' as requiring reporting whenever money is spent, as the law already requires of individuals." *Id.* at 876–77 (citations omitted).

Conversely, in this case the ongoing reporting requirement is absolutely tethered to continuing speech. The lobbyist must file standard registration forms "not later than January fifth of each year or five days after beginning any activities as a lobbyist." Mo. Rev. Stat. § 105.473.1. That is the initial and annual disclosure. Calzone points to the monthly reports, specifically the reports examined by the Commission: "14 monthly reports, 12 filed under penalty of perjury." Transcript of 4/25/2017 Hearing at 8 (statement of Mr. Morgan). Those reports are required only for "any period of time in which a lobbyist continues to act as a . . . legislative lobbyist." Mo. Rev. Stat. § 105.473.3(1). Thus, both annual and monthly reports are required only if the lobbyist continues to lobby on behalf of a third party. The Eighth Circuit suggested an appropriately tailored requirement in *Swanson*: "requiring reporting whenever money is spent." *Swanson*, 692 F.3d at 877. Similarly, Missouri requires reporting only when continuing to lobby.

Further, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* at 876 (quoting *Davis v. FEC*, 554 U.S. 724, 744 (2008)). The burden on Calzone's First Amendment rights is not great. In the September 2015 hearing, the Ethics Commission heard the testimony of Randy Scherr. [Doc. 17-1, p. 32]. Mr. Scherr worked as a lobbyist since the late 1970s and serves on the board of the Missouri Society of Governmental Consultants. As part of his testimony, Mr. Scherr detailed the process for registering as a lobbyist in Missouri:

> [R]egistration is required at the beginning of the year. The annual requirement now takes, oh, I'd say a minute or two. You go on and you simply renew – enter your credit card number, pay your $10 --- or $11 I think. It maybe takes two minutes, three minutes to register . . .

*Id.* at 34 of 239:24–25; 35 of 239:1–4; 26 of 239:1–5.   Further, Calzone acting for Missouri First has control over whether to trigger those requirements: he need only make reports when he continues to lobby on behalf of Missouri First. The Commission has made clear that no registration or reporting is necessary when Calzone speaks only as a citizen. Transcript of 2/3/2017 Oral Argument at 10 (statement of Mr. Weisel).

Finally, the information Missouri requires is directly correlated to the harms it seeks to avoid. The disclosures include the "lobbyist's name and business address, the name and address of all persons such lobbyist employs for lobbying purposes, the name and address of each lobbyist principal by whom such lobbyist is employed or in whose interest such lobbyist appears." Mo. Rev. Stat. § 105.473. Knowing the names and addresses of lobbyists is the least intrusive means of accomplishing the government's interest in "transparency as to who is making efforts to influence the legislature". Transcript of 4/25/2017 Hearing at 16 (statement of Ms. Harrison).

Therefore, the Court finds there is a substantial relation between the governmental interest and the information required to be disclosed. As such, the Court holds Missouri's statute does not violate the First Amendment as applied to Calzone.

**B. Facial Challenge**

Calzone also challenges the constitutionality of the Missouri lobbyist statute on the grounds of vagueness. This is a facial challenge, which means that it can only succeed if on its face the Missouri lobbyist statute ". . . fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1143 (8th Cir. 2005) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

Missouri defines a "legislative lobbyist" as:

> [A]ny natural person who acts for the purpose of attempting to influence the taking, passage, amendment, delay or defeat of any official action on any bill, resolution, amendment, nomination, appointment, report or any other action or any other matter pending or proposed in a legislative committee in either house of the general assembly, or in any matter which may be the subject of action by the general assembly and in connection with such activity" who also:
> . . .
> (c) Is **designated** to act as a lobbyist by any person, business entity, governmental entity, religious organization, nonprofit corporation, association or other entity."

Mo. Rev. Stat. § 105.470 (emphasis added).

Calzone contends that what is prohibited by the statute is not clearly defined. [Doc. 2, p. 13] (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Calzone contends that the word "designate" is vague because of the evidence the Commission considered in finding he was designated as a lobbyist for Missouri First, specifically "that he had sort of done it himself." Transcript of 4/25/2017 Hearing at 10 (statement of Mr. Morgan).

The Ethics Commission found that "[s]ince 2013, Respondent Calzone has been designated by the action of Missouri First, Inc., and its constituent members for the purpose of attempting to influence official action on the bills, resolutions, amendments, and other matters." [Doc. 1-2, Exhibit D]. In making that finding, the Commission concluded that when he submitted witness statements to the legislature that had been solicited by Missouri First, Calzone was speaking for Missouri First and not for himself. It considered substantial circumstantial evidence to reach its conclusions.[6] [Doc. 20, pp. 11–12].

This Court previously found that a federal court is not the forum to review the Commission's findings, including the self-designation finding. The Court also found the word "designate" can be defined readily:

> The term 'designate' is defined by Webster's Third New International Dictionary as 'to make known directly as if by sign; to distinguish as to class; Specify, stipulate; to declare to be; to name esp. to a post or function.'" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 612 (1986). 'Designate may apply to choosing or detailing a person or group for a certain post by a person or group having power or right to choose.' *Id.*

[Doc. 1-2, Exhibit D, p. 7]. The Court found this is the common understanding of the word "designate", and thus the word does "provide people of ordinary intelligence a reasonable

---

[6]     The Commission relied on, *inter alia*, the following pertinent facts from the record: (1) Calzone incorporated Missouri First and serves as its director, registered agent, president, secretary, and as one of its three members of its board of directors; (2) Mr. Calzone regularly comes to meet with individual legislators, legislative staff, and other legislative groups, to talk about specific legislation and potential legislation, and what should be passed or blocked. *Id.* at 18 of 239:21–25; 19 of 239:1–3. He would typically identify himself as "Ron Calzone, Director of Missouri First, or Ron Calzone, a director of Missouri First." *Id.* at 88 of 239:13–18. On a witness form in the Missouri Senate, "Mr. Calzone identifie[d] himself as appearing on behalf -- not of himself but appearing on behalf of Missouri First, Inc. When he signed that and said I'm appearing on behalf of Missouri First, Inc., he was the only officer for Missouri First, Inc. He was the president and he was the secretary." *Id.* at 19 of 239:4–11; (3) Missouri First's Charter states that legislative lobbying is used as a purpose and a method of operation. [Doc. 17-1, p. 14 of 239:1–5, 8–10]; (4) Missouri First encourages new membership by stating: "That old saying, there is strength in numbers, holds true, especially when lobbying Missouri House and Senate Members." *Id.* at 95 of 239:10–12; and (5) Missouri First recruited new members by promising strong lobbying and "working hard to represent your values in the issues that touch your life." *Id.* at 95 of 239:13–16.

opportunity to understand what conduct it prohibits." [Doc. 20, p. 11] (citing *Reprod. Health Servs.*, 428 F.3d at 1143 (8th Cir. 2005)).

Calzone now seems to concede that "[p]erhaps, applying the plain meaning dictionary definition, the word 'designate' is not vague." [Doc. 33, p. 8] (citing [Doc. 32, p. 6]). Calzone's facial challenge now seems to be that the Commission would never have found that Calzone designated himself as a lobbyist for Missouri First, but for the vagueness of the term designate.

To the extent Calzone is attempting a backdoor challenge to the findings of the Commission, his vagueness claim is rejected as beyond the Court's jurisdiction. To the extent Calzone is relying on the findings of the Commission to show that the term designate can be misunderstood and is therefore vague, the Court rejects his argument for the following reasons.

To demonstrate that the term designate is unconstitutionally vague, Calzone relies heavily on the Parties' stipulation that "The board of directors of Missouri First, Inc. has never taken official action to name Plaintiff as the legislative lobbyist for Missouri First, Inc." [Doc. 28, ¶ 6]. Calzone contends that because Missouri First never took official action to designate him, but he was nevertheless found to have been designated, the plain meaning definition of the word "designate" "is clearly not the one the government is using." [Doc. 33, p. 8]. Consequently, the term is vague.

Defendant clarified that although the board of directors took no formal or official action to designate Calzone as a legislative lobbyist, "[a]s the Director, incorporator, sole officer, registered agent, and one of the three board positions at Missouri First, Mr. Calzone has the ability to determine how and who will be present will be present . . . will present the agenda of Missouri First to the general assembly." Transcript of 4/25/2017 Hearing at 13 (statement of Ms. Harrison).

Calzone argues that, without an official act from the Missouri First board of directors, his personal actions could not suffice to designate him a lobbyist and any contrary finding renders the term designate unconstitutionally vague. However, Mr. Calzone was the president, secretary, and board member for Missouri First and held himself out as such when attempting to influence legislation. Crucially, Calzone is the registered agent of Missouri First, a fact the Commission noted several times throughout the hearing. *See* [Doc. 17, 12:13, 12:22, 91:13].

Under Missouri law, it is well established that a principal may be bound by the actions of its agent. *See, e.g.*, *Shelby v. Slepekis*, 687 S.W.2d 231, 234 (Mo. Ct. App. 1985). Because Calzone is the registered agent of Missouri First, the theory of express agency support's the Ethics Commission's finding that Calzone had the authority to designate himself as a lobbyist for Missouri First. *See Stram v. Miller*, 663 S.W.2d 269, 274 (Mo. Ct. App. 1983). He has never testified to the contrary nor has he presented evidence or case law that shows an agent of Missouri First could not designate someone as a lobbyist for the organization.[7] Under agency law, that authority extends to designating himself to be the lobbyist.

Because Calzone had the authority to act on behalf of Missouri First as its agent, even without action from the board of directors, the Commission's finding is directly in keeping with the plain meaning definition as used in Mo. Rev. Stat. § 105.470(2)(c). The agent of Missouri First "choos[e] . . . a person . . . for a certain post," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 612 (1986), and this application does not "fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1143 (8th Cir. 2005). Therefore, the Court rejects Calzone's argument that the use of the term self-

---

[7]    Indeed, most decisions to retain a lobbyist are not made by a board of directors. It is agents of the corporation, such as a CEO or HR Department or Government Relations Department that make such day to day decisions.

designation demonstrates that the term "designate" as used in the statute or as found by the Commission, makes the term vague. Calzone has not demonstrated success on the merits of his facial challenge.

## III. Conclusion

Because Calzone has not demonstrated success on the merits of his claim, facially or as applied, Calzone's Motion for a Permanent Injunction, [Doc. 2], is denied.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: June 26, 2017
Jefferson City, Missouri